May it please the Court. My name is Alan Hurston. I represent I.C. Marketing, Inc. The complaint alleges that Amos Press defamed I.C. Marketing by publishing its subscriber alert, which is found throughout the record. I'd like to first address the two rulings on evidence that the District Court made. First, the District Court struck portions of the declaration of Mr. Simpson. That declaration commences at E.R. 119. Exhibit 2 to the declaration was a warning to CoinWorld subscribers also published by Amos Press. That appears at E.R. 129. The subscriber alert had stated that I.C. Marketing was selling at unauthorized prices. What this Exhibit 2 explains is what was meant by unauthorized prices, that I.C. Marketing was selling at a lower price. It was $5 less for three years, right? Yes. Let me ask you something. It looks to me like the most important statement here is money sent to it for subscriptions will not buy weekly issues of CoinWorld. People think if they send their money to this service, they won't actually get their magazines. Yes. Basically, that was the tenor of the subscriber alert, that you send money. Now, what I want to know is what does the record show about whether that's true? Whether I.C. Marketing is either careless or crooked and doesn't send the money to Amos Press and give people their magazines, or whether it does except for the normal run of errors in a mass situation? The record shows that money was sent to Amos Press, and Amos Press did fulfill the subscription sold by I.C. Marketing. Where should I look to see whether that statement is true or false? Will you tell us where it shows that after the company was notified that it was no longer an agent and could not do this, it actually sent it in under its own name as opposed to some backdoor way, and Amos accepted it from I.C. Marketing or from whatever its actual name was that was told not to sell it anymore. Show us where that is, too. First, where they actually fulfilled was that SCR 829-47 shows the actual sales, and again, it was repeated at SCR 239-57. Was that before or after? That was before, I believe, or maybe after. As to the statement that they could not sell anymore, our position is that Mr. Kahn, who was an agent of – was the officer of the agent of Amos Press, he testified that he is the one who hires the independent agents, that he makes that determination, not Amos Press, and that's consistent with the MPA guidelines, which were put into evidence by Amos Press also, MPA being the Magazine Publishers of America, the trade association that apparently Amos Press was a member of. Amos Press directly told you, you are not – if you have been an agent, which you haven't been, not with our knowledge, you are no longer an agent, you are not authorized to sell our magazine. At best, you are a sub-agent of the clearinghouse agents, we'll call them, and you were directed by the principal that you were not an agent anymore. The question is, where it is shown that indeed they accepted them afterwards in your name as an agent as opposed to some slippery pseudonym or something that you managed to slip it in the back door. That's the question. I don't know if that's in the record at all, Your Honor. Well, I don't think it is in the record. I think the record, as I see the record, says what they said is absolutely true. We will not accept – you won't get our subscriptions because we won't accept money from these guys. We won't accept them from these people. They're not our agents. That's what they said. What's untrue about that? That you could somehow sneak around back and get them to accept it without their knowing it? Is that what makes it untrue? Because this is a different system. This is a very special system of selling magazines. I'm not asking about your special systems. I'm saying you were told that you are not their agent and you are not to sell their magazines, period. Now, if your point is they somehow accepted money because we managed to sneak it in the back door without them knowing it, I don't see how that makes their statement untrue or even close to untrue. Well, Mr. Kahn testified that he is the agent and he authorizes the subagents. His company does. And his company authorized IC Marketing to go ahead and sell. Do you understand that a principal can terminate the subagent, the agent notwithstanding? That's right. Do you understand that as a matter of law? I understand that. And did they terminate your subagency? Yes. And if they did, did you then go ahead and keep purporting that you were able to sell as a subagent? That's right. That's what you did. That's right. That's what they said you couldn't do in their publication. You may not like it legally, but what's untrue about that? We're talking defamation. Why is that false? Okay. Well, the falsity, there are other falsities as well. No, we're talking about this one now, okay? Because under the guidelines of the Magazine Publishers of America, the subagents are hired by the agent. I'm not talking about that. I'm talking, you know, you may not want to address the question. Why is it false if the principal has told you you are no longer able to be a subagent of ours? You may not sell our magazine, and we will not accept subscriptions you sell. Why is it false for them to put in their publication that that's exactly the case? Okay. It's false because under this system, the publisher cannot set those rules. Those rules are set by the agent, the clearinghouse agent is the one who says who can sell, not the publisher. That is why it's false. Well, wait a minute. I don't get this. It seems to me there are two things being mixed together here. One is I would think CoinWorld is entitled to say who we'll accept subscriptions from and who we won't. And if they want to say we won't accept any orders from anybody's grandmother for a gift subscription for their grandchild, that's up to them. It may seem silly, but it's up to them. It's their magazine. The other thing is do they say bad things that are false about a business? Well, for example, this business, this plaintiff in this case, that might affect its business generally. They can say we're not going to do business with it anymore. But if they say this business generally takes people's money and doesn't send them to the magazine so people don't get their subscriptions, they just get ripped off, and that's a false statement. That could also hurt ICM when it sells subscriptions to, I don't know, Boys Life and Life Magazine if it's still in business, and Reader's Digest and whoever else they may sell subscriptions for. What I want to know about is not the former where they say we won't take subscriptions from this outfit anymore. And it's true, they won't, and that's their right. Or whether it's the latter where they call them crooks who pocket the subscription money when it's false. Yes, it is the latter. And that is the tenor of the subscription alert, that if you send money to them, you're going to lose your money. That is basically what it was. And they've got five letters in evidence from subscribers. There's what say that. It says that you will not you will send in your money. You will not receive weekly issues of Coinworld is what it said, basically saying you've lost your money. It says the money sent to it for subscriptions will not buy weekly issues of Coinworld. That's true. It will not because you're not permitted to sell Coinworld, and it won't buy them unless you manage to sneak it in the back door. Is that not true? If you sneak it in the back door, then they do buy them. Of course. If you manage to defraud the principal who has terminated you by selling it stuff when it's told you you can't, then you will have bought it. But what they say is you have no authority to do it, and money sent for subscriptions won't buy weekly issues of Coinworld. And it won't unless you commit a fraud against Coinworld, of course. I disagree that it's a fraud. Well, you may, but the point is unless you force them to do it by sneaking it in the back door and they don't catch you. Let me put it that way. So they're telling their customers, and you said we're upstanding, honest businessmen. What you say is these upstanding, honest businessmen can't sell you Coinworld. That's what they say. What's wrong with that? You can't. As a matter of fact, you can't sell them Coinworld legally. I disagree if we're authorized by the agent. Go back to that, right? Yeah. The general agent authorized you, but the principal deauthorized you. The MPA guidelines say that the publisher can only advise the agent not to continue with the subagent. So it can only advise. It can't force. That's right in the MPA guidelines. That's in evidence. So in that context. And those guidelines are law. So when the principal says, I don't care about some stinking guidelines. I'm telling you, you cannot be our agent. You're saying tough. We can do it anyway. Well, presumably the guidelines are a contract between the agent and the publisher. Presumably. Right. That's the way it is throughout the industry. I think Mr. Kahn's testimony is very clear that he selects the subagents. And he also, another thing was the unauthorized price. That was false because very clearly, even valuemax.com was selling at $19.97 for one year. And that was put into evidence by English press. Mr. Kahn testified that the agent could sell at any, a subagent could sell at any price it wants. And he doesn't even know what the price is. So that's another element of a false statement about plaintiff. Wholly apart from that. Why aren't these statements privileged under any privilege that you want to pick out? Because Amos has a clear interest in its own reputational interest and its own financial interest in goodwill. Well. In communicating with subscribers or potential subscribers who might blame the absence of a renewal subscription on Amos rather than on ICM. Well, it's not the protection, the privilege to protect the speaker's interest. It's our position it's not the lawful protection because what Amos was trying to do was keep its subscription price artificially high. You know, this is not an antitrust case. There's no evidence in the record, apart from Simpson's stricken declaration, because it's totally without foundation, to suggest that was the motive at all. They just don't want their subscribers to be misled when the renewal subscriptions can be obtained from anybody other than Amos. Well, the request for judicial notice facts. You know what? The request for judicial notice is of two unrelated antitrust cases pending in some other place, not having anything to do with these parties or this situation. It's wholly irrelevant. Well, it was a class action case. So what? I mean, it's just wholly irrelevant. Well, it goes to show what publishers do. Don't you have to win it first in order to establish anything from it? Perhaps it does show that publishers... It's not a defense class. It's a plaintiff's class. And Amos isn't one of the defendants. So maybe some publishers do big naughty. What in the world does that have to do with Amos? Well, the Magazine Publishers of America was one of the defendants. And? And Amos put into evidence the guidelines of the magazine publishers. Well, I feel like I'm being led down a path that doesn't go anywhere. I mean, I'm perfectly willing to accept that Amos Press is idiosyncratic and that they don't follow the practices of the trade. They don't follow the guidelines. And I'm thinking, so what? It just doesn't matter to this case that they are an idiosyncratic oddball publisher in, what is it, So what? All that matters is whether they're lying about... I see marketing in a way that harms its business. And there are two kinds of statements they make. One is, we don't want to do business with them. I don't see any problem with that, even if it's stupid and even if it's contrary to industry practice. It seems to me it's just like Mont Blanc Pens saying, We only want classy stores to sell our pens. We don't want them at Walmart. So they're right, whether it's a good idea or not. The other kind of statement is, these people are crooks. They pocket your money instead of sending it to the magazine for subscriptions. Now, I'm sort of semi-picking that up from the way the warnings are worded. But they don't say it explicitly. And I wonder just how explicit they get. Do they do that? Well, we have letters introduced into evidence from their subscribers to the Oregon Department of Justice. Mr. Beal writes at ER 111 that he had fallen for a scam and stopped paying his check, and that he requested that he be included in the letter. There's not a magazine in America that doesn't occasionally generate those kind of letters, no matter how people subscribe. There are a lot of mistakes made in subscription lists. Right, but these people saw the subscriber alert and saw it was factual and thought they had lost money and fallen for a scam and had written letters. That's why it shows it was factual. They believed that they had been taken for a scam and lost their money. How about the stop payment on the check? Excuse me? I thought he said he stopped paying on the check. Right. So he didn't lose any money. He did. He stopped payment on a check, sending money to a non-agent of the magazine. They wanted me included in legal action, he said, against Dicey Marketing. So he thought there were facts there of bad practices by Dicey Marketing, which is different than being unauthorized. Now, I want to mention a counterclaim, too, which whether or not we interfered or Dicey Marketing interfered with the business of Amos Press, our position is it was foreseeable that when things are put on agency for sale, that others are going to do the selling, and that's what Mr. Kahn testified to, that people will do the selling. And if Dicey Marketing is interfering and has a bogus subscription rate, what about all the others, including ValueMax.com, which was selling at $19.97 for one year? As to injunctive relief to stop selling, or not to stop selling but to not to send out the solicitations, our position is that that is not appropriate under Article I, Section 8 of the Oregon Constitution because the Oregon Constitution goes further than the First Amendment. It protects commercial speech. And I doubt it protects misleading commercial speech. Well, it does prohibit prior restraints on speech. No doubt it does. And this is a prior restraint on speech, the injunction. No doubt it is, but you can get one if the speech is misleading. If it's fraud, it has to be fraud by our position. Under Oregon law, not misleading but fraud, and the elements of fraud were never proven in the summary judgment. You're taking this away from defamation and toward your right to sell the magazines. And I'm thinking this is like if Sam's Warehouse or Walmart bought a whole lot of Montblanc pens from some distressed upscale shop and then put an ad in the paper saying, buy your Montblanc pens for half price at Sam's Warehouse. And Montblanc put an ad in the paper saying, we won't honor warranties, they're not authorized to sell Montblanc pens, we don't sell Montblanc through Sam's Warehouse. And I can't see why they couldn't get an injunction. Well, Oregon law doesn't permit prior restraints on speech. And perhaps this Court will consider certifying that question to the Oregon Supreme Court. That's the protection of Article 1, Section 8. Are there any questions? I'd like to reserve my ten seconds left. You may reserve your ten seconds. Thank you. Good morning, Your Honors. May it please the Court, on behalf of Defendant Appellee Amos Press, Richard Gaylor, Your Honors, respectfully urging this Court and requesting this Court to affirm the orders of the District Court in all respects. Counsel, help me on something here. I don't have any problem, as you probably figured out from my questions, with CoinWorld saying, we don't want to do business with this outfit, we don't want to take subscriptions from it. Understood. I do have a problem with their calling IC Marketing Crooks if they're not. Right. And this IC Marketing has business interests besides CoinWorld. That's true. It has all kinds of subscriptions it's trying to sell. That's true. And if people think they pocket the money, they're not going to be able to sell them. Right. And when I read what CoinWorld wrote, they don't say explicitly, they pocket the money. But if I were a reader not paying the closest attention, if I weren't reading it as a judge, I would think I better not use this outfit. They pocket the money because they're an unscrupulous firm. They conduct a scam. If I send them money, it won't buy subscriptions. And it looks like you really don't have evidence that they steal the money. Your Honor, in the record, and I appreciate the question in the record, the affidavits of Michael Lawrence, the editorial director, and of Terry Wise, the circulation manager for Amos Press, will answer that question. And, in fact, consumers, subscribers of CoinWorld did complain in this time period before the subscriber alert in April of 2001, there were specific complaints from subscribers that they sent money to IC Marketing and did not get their CoinWorld subscriptions. You know, that brings us to that question I asked your adversary. Yes. A lot of people subscribe. This is a mass marketing kind of thing, subscriptions to magazines. Yes. And there are sure to be some errors. Yes. I doubt if there's a magazine in America that has not had people that sent their money and didn't get the magazine. Yes, understood, Your Honor. So what does that prove? What it proves in this context, again, with IC Marketing, and, Your Honor, you asked questions about whether Amos Press was some idiosyncratic publisher in Sydney, Ohio. It is in Sydney, Ohio, but the record reflects many, many other publishers had these same issues and same concerns with this agent, IC Marketing, and all of their DBAs, which begs the question of whether or not they really are all that interested in their reputation as a legitimate business. These DBAs were all just parts of their scam, unscrupulous practices, and bogus approach to this industry. Look, it does look kind of sneaky because it looks like a bill instead of a solicitation. Absolutely. And it looks like a bill from some service bureau for the magazine instead of an independent solicitation. True, all true. But I still want to know, what's the evidence that they steal the money? Is there anything besides affidavits that some subscribers have complained? Yes. When Mr. Hurston made reference to Mr. Kahn, Bob Kahn of Publications Unlimited, he was actually a sub-agent as well. The chain here was the publisher Amos that did have an authorized agent, NCS, National Community Services in Nashville. They were an approved authorized agent. That NCS did business with a group called Publications Unlimited. That's Mr. Kahn's outfit in Florida. Now Mr. Kahn in his deposition, which is in the record, he says when confronted with these records that Mr. Hurston pointed out to you, this notion from ICM that they had made submissions for coin world remittance, his records didn't even reflect that. So he, Bob Kahn, was the one doing business directly with ICM. He was saying his records didn't reflect that these subscriptions had been cleared through him. It stopped at ICM. Is there more than one or two subscriptions? There's a whole list of them in his deposition that he had no evidence of. So he's saying here's a whole bunch where they sent the money to ICM and ICM didn't send the money to me to send to coin world. It didn't come through Publications Unlimited. And obviously if it didn't come through Publications Unlimited, it certainly didn't get to coin world. It's there. It is. And as your honor asked clearly in the context of this subscriber alert, which is April 2001, if you put it in the context of what led up to that and really look at the framework of the proper occasion upon which this subscriber alert was published, they had over 100 complaints from the beginning of 2001 up until this point in time. Their regular outside counsel, Mr. Garmhausen, in March of 2001, sent a clear cease and desist letter to IC Marketing, which the record reflects. IC Marketing responded and said, thank you for your cease and desist letter. We're going to continue to sell this magazine because we can, because we think we can. We're going to unilaterally grant ourselves authority to do this. The authority part strikes me as kind of a whole different deal. You can tell them we don't have an antitrust case here. You're right. We do not have an antitrust case. I'm thinking if they want to, they can buy a bunch of coin worlds, take out the subscription blanks, fill them in with the person's name, and send a check. And coin world will never know the difference. And I don't know if that counts as fraud. It counts as violation of coin world's command. Right. And the other part about that, while Mr. Herson did make reference to some industry guidelines, Your Honor, as the principal, what Amos Press did here, it was very clear with respect to the agent it authorized, NCS. It said, look, the only way any sub-agent is ever going to be authorized is if they're disclosed to us. And obviously that wasn't the case here with respect to IC Marketing. And if they're disclosed, they still have to follow certain terms that we set on price, on the length of subscriptions, on whether or not they could solicit new subscriptions versus renewals. All of those things were violated by this plaintiff appellant. As we said at times surrounding the record below, there's no support for this theory, this fundamental kind of premise that IC Marketing bases all of its claims, that it somehow, as an independent sales agent, could unilaterally deem itself authorized to carry out these business practices. And as I say again, Your Honors, so you don't get some sense that this is one publisher out there acting in a very idiosyncratic method, because the record is clear from the biggest publishers like Time Magazine to other specialty publications. In fact, this court has in its pipeline right now two cases coming right behind this one that are exactly the same, involving Taunton Press and Outdoor Empire Publishing. They said they issued the same subscriber alerts, they issued the same cease and desist, which were ignored by this company. Tell me where, I know it's at 134 to 144, tell me where to look in Robert Kahn's deposition excerpt, where it shows me that ICM doesn't send the money. Your Honor, unfortunately, I don't have the ER numbers right here handy for me. It's not a particularly… You got any kind of number handy? His deposition starts right around 201 in the ER. It's not a particularly long… His depo starts at ER 204, and the actual excerpts from his deposition that we included look like end around 231. The entirety of his deposition, which we included and cited to, is 204 to 231. We did include some exhibits that were also used in his deposition, which go from 232 to 257. It's early on, as I recall, in that ER designation, Your Honor, where Mr. Kahn was going through a list of… which were reflecting the submissions of solicitations for CoinWorld, where he was saying, we don't have record of these. And the other thing that you'll see in that whole submission was, as Your Honor asked earlier, these weren't remittances with a designation for IC Marketing or Publisher Services Exchange. Mr. Simpson was using individuals' names to fly under the radar screen. LG Puckett, Jim Smith, all of these other names of individuals, again, to fly under the radar screen. Your Honors, unless there are other questions, again, we urge affirmance. We think that the district court properly found on several basis that the summary judgment was properly granted, dismissing the two major claims against Amos Press, and granting the injunction, the permanent injunction, this has to stop. They're going to ignore every cease and desist that a publisher like Amos will ever send. And in fact, they're going to thumb their nose even at permanent injunctions that the court enters. But we're going to deal with that in another context. Thank you. Thank you, Mr. Gailer. Mr. Herson. Very well. Does the court have any final questions for me? I do. Could you respond on the con deposition? Well, I was just glancing forward. He asked, there was one question he was asked if he knew the Publisher Services Exchange was paying on scrupulous tactics. And he said, no, he was unaware of that. I think what counsel was referring to, though, he at one point said that he had no record of any sales coming from Publisher Services Exchange, and they couldn't find any record, which contradicts what he had said earlier about dealing with Publisher Services Exchange. That's my recollection. I don't have the whole thing in front of me right now, though. Thank you. Thank you. Counsel, thank you for your argument. The matter just argued will be submitted.
judges: Fernandez, Rymer, Kleinfeld